# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

|  |  |  |
|---|---|---|
| **MISSION INTEGRATED TECHNOLOGIES, LLC,** | ) ) ) ) | |
| **Plaintiff,** | ) ) ) | **1:23cv1608 (LMB/JFA)** |
| **v.** | ) ) | |
| **JOSHUA R. CLEMENTE,** *et al.*, | ) ) | |
| **Defendants.** | ) ) ) | |

## FIRST AMENDED COMPLAINT

Plaintiff, Mission Integrated Technologies, LLC ("MIT"), submits its First Amended Complaint and states as follows. The purpose of this Amended Complaint is to recognize that Defendant, Timothy Clemente ("Tim"), has been removed as President of MIT and no longer holds any managerial positions at MIT. Therefore, this action is being converted from a derivative action filed on behalf of MIT to a direct action by MIT against both Defendants, Tim and his son Joshua ("Josh") Clemente.

## NATURE OF THE ACTION

1.     MIT seeks monetary and injunctive relief from Tim and Josh for the following causes of action: breach of fiduciary duties (Count I – against Tim); misappropriation of trade secrets (Count II – against Tim and Josh); business conspiracy (Count III – against Tim and Josh); unjust enrichment (Count IV – against Josh); common-law fraud (Count V – against Tim); and breach of contract (Count VI – against Josh; Count VII – against Tim).

## PARTIES

2.    MIT is a Delaware limited liability company with its principal place of business in Vienna, Virginia. MIT's business is the design, manufacture, marketing, and distribution of a variety of state-of-the-art tactical and rescue products for law-enforcement, fire-rescue, and military customers around the world. MIT's primary product is the Articulating Rapid Entry System ("ARES"), a vehicle-mounted articulating stairway capable of delivering response forces quickly and precisely during crisis scenarios. MIT's current members are non-party F2E Holdings, LLC (81% interest), Tim (13% interest), and non-party Kenneth Fournier (6% interest).

3.    Tim is a resident and citizen of Montana. Tim is and has been a member of MIT since its founding in 2013. Tim owned approximately 25% of MIT's membership units at its founding. He currently owns approximately 13% of MIT's membership units.

4.    Josh is a resident and citizen of Texas. Josh assisted Tim on the ARES design for the benefit of MIT.  Josh is Tim's son.

## JURISDICTION AND VENUE

5.    This Court has personal jurisdiction over Tim because he conducted business in Virginia on behalf of MIT.  In addition, MIT's operating agreement provides that its members "agree to submit to the jurisdiction of the [Commonwealth] of Virginia."

6.    This Court has personal jurisdiction over Josh because he assisted Tim in performing work for the benefit of MIT in Virginia; he delivered work product to MIT in Virginia; he sent at least one invoice to MIT in Virginia; he regularly directed communications to MIT in Virginia; he signed at least one contract on behalf of MIT that call for disputes to be resolved in Virginia; and he entered into at least one contract with MIT that calls for disputes to be resolved in Fairfax, Virginia.

7. This Court has federal-question subject-matter jurisdiction over this lawsuit because Josh has filed a counterclaim against MIT for patent infringement.

8. Venue is proper because each of the parties to this lawsuit regularly transacted business in Fairfax County at all times relevant to this lawsuit.

## FACTUAL BACKGROUND

### The Formation of MIT

9. On or about October 7, 2013, F2E and Tim entered into the Operating Agreement of Mission Integrated Technologies, LLC (the "MIT Operating Agreement"). Before that date, the company operated under the name Assault Rescue Elevated System, LLC.

10. MIT's stated business purpose under the MIT Operating Agreement is to design, manufacture, market, and distribute a variety of state-of-the-art tactical and rescue products to law-enforcement, fire-rescue, and military customers around the world, with its "premier products" being "articulating vehicle-based assault and rescue systems, such as the ARES."

11. A true and accurate photograph of the current ARES model is below:



12. At MIT's inception, F2E owned approximately 75% and Tim owned approximately 25% of MIT.

Case 2:24-mc-00048-PA-PVC    Document 1-3    Filed 03/29/24    Page 5 of 31    Page ID
#:29
Case 1:23-cv-01608-LMB-JFA    Document 25    Filed 01/03/24    Page 4 of 30 PageID# 704

13.     F2E and Tim initially agreed that F2E would own 80% and Tim would own 20% of MIT. At Tim's request, F2E agreed to increase Tim's share by 5% with the understanding that individuals who would be assisting Tim in the development of the ARES system on behalf of MIT would be compensated with ownership in MIT that was to be taken from Tim's additional 5% share.

14.     MIT is a member-managed LLC. MIT's members designated Tim to serve as the company's President with authority "only as Approved by the Members." Tim served as President of MIT until December 16, 2023, when a majority of MIT's members voted to remove him as President and strip him of all managerial powers.

### Relevant MIT Operating Agreement Provisions

15.     Section 15(J) of the MIT Operating Agreement provides that it "shall be governed by, and interpreted in accordance with, the laws of the State of Delaware."

16.     The MIT Operating Agreement describes the powers of MIT's members. Section 3(D) provides that "[n]o Member or Financial Interest Holder has the authority or power to act for or on behalf of, to bind, or to incur any liability on behalf of the LLC except as specifically provided in this [Operating] Agreement." Section 7(A) provides that "[a]ll decisions taken by the Members unless otherwise specifically stated herein shall require an affirmative vote or written consent of the Members." Section 7(A) further provides that "[n]o person may act unilaterally on behalf of the LLC absent the approval of a majority of the Members."

17.     Section 14(A) of the MIT Operating Agreement provides that "as long as any Member remains a nominal or beneficial interest holder in the LLC, and for a period of two (2) years thereafter,

no Member shall directly or indirectly (e.g., through an affiliate of any Member), engage in any activities within the scope of the Business of the LLC without the Approval of the Members."

18.   Section 14(B) of the MIT Operating Agreement provides that "all intellectual property, including but not limited to names, trade names, internet domains, inventions, designs, drawings, formulae, recipes, discoveries, concepts, ideas, know-how, information, developed or conceived inventions, and improvements, either patentable or not, and either contributed to the LLC by the Members or developed or improved by the LLC is owned at all times by the LLC." It further provides that "all domain names, trade names, data and software associated with the Mission Integrated Technologies or Assault Rescue Elevated System concepts . . . belong exclusively to, and to the extent required, are assigned to, the LLC." It further provides that "[a]ll past and future inventions and contributions made by the Members related to the Mission Integrated Technologies and Assault Rescue Elevated Systems projects shall be deemed work for hire and shall belong exclusively to the LLC, unless otherwise waived by Approval of the Members."

19.   Section 7(B) of the MIT Operating Agreement provides that MIT's members may designate "a Manager, President, Vice President, Secretary, and/or Treasurer" who "shall have the general powers and duties of management typically vested in the office of president, vice-president, secretary or treasurer of a limited liability company, as applicable, and such other powers and duties as may be prescribed by the Members."

20.   The MIT Operating Agreement defines the fiduciary duties of loyalty and care applicable to MIT's officers. Section 7(D) provides that each of MIT's officers "shall exercise all powers and duties entrusted to him, her, or it, in the matters such person, individually or on behalf of an entity, believes in good faith to be in the best interest of the LLC, using a standard of care as a person in a

Case 2:24-mc-00048-PA-PVC   Document 1-3   Filed 03/29/24   Page 7 of 31   Page ID
#:31
Case 1:23-cv-01608-LMB-JFA   Document 25   Filed 01/03/24   Page 6 of 30 PageID# 706

like position would use under similar circumstances, including reasonable inquiry and ordinary prudence."

### Circumstances Leading to Josh's Work on ARES

21.     Tim advocated for Josh to assist him on the ARES design, since Tim is not an engineer and Josh has a background in mechanical engineering. Although F2E preferred to engage a professional engineering firm, Tim prevailed upon F2E that MIT would have greater control over the design and development of ARES by having his son assist him instead of a professional engineering firm.

22.     Following Tim's recommendation, F2E agreed to allow Tim to use Josh and another individual, Kenneth Fournier ("Fournier"), to perform engineering design services for MIT under Tim's supervision. F2E and Tim agreed that Josh and Fournier would be compensated for assisting Tim with a 5% ownership interest in MIT to be taken from Tim's 25% share of the company (thereby reducing Tim's ownership to 20% and maintaining F2E's ownership at 75%).

### False Representations Regarding Non-Disclosure & Non-Circumvention Agreement

23.     F2E agreed to allow Josh and Fournier to assist Tim on the ARES design in reliance on representations by Tim that each of them would, and in fact did, sign a standard non-disclosure and non-circumvention agreement, which protected MIT's rights and interests in confidential information provided to or developed by Josh and Fournier in the course of their work. F2E's agreement to allow Josh and Fournier to assist Tim in performing work for MIT on ARES was contingent on Josh and Fournier each signing such a non-disclosure and non-circumvention agreement.

24.     Tim knew that F2E's agreement to allow Josh and Fournier to assist him in performing work for MIT on ARES was contingent on MIT obtaining the aforementioned non-disclosure and non-circumvention agreements. In numerous conversations both before and after MIT's formation, F2E's

Case 2:24-mc-00048-PA-PVC    Document 1-3    Filed 03/29/24    Page 8 of 31    Page ID
#:32
Case 1:23-cv-01608-LMB-JFA    Document 25    Filed 01/03/24    Page 7 of 30 PageID# 707

owner, Fahmi Alubbad ("Alubbad"), routinely emphasized to Tim the importance of protecting the company's intellectual property, including trade secrets and other confidential business information. Tim also was aware of Alubbad's strict practice of requiring business associates to sign non-disclosure and non-circumvention agreements before giving them access to trade secrets and other confidential business information. To wit, Alubbad, through another company he owned (Atlantis Consultants Limited Corporation ("Atlantis")), required Tim to sign a non-disclosure and non-circumvention agreement before sharing information with Tim during the business discussions leading to the formation of MIT and its predecessor company.

25.    Tim knew that if Alubbad were aware that an individual or entity had access to MIT's trade secrets and other confidential business information without being subject to a non-disclosure and non-circumvention agreement, F2E would insist that MIT immediately terminate that person's access and remove them from the ARES project.

26.    On or about August 7, 2013, Tim reported to Alubbad that Josh was "filling out the [non-disclosure and non-circumvention agreement] and will email the signed cop[y] back to you."

27.    Contrary to Tim's representation, Josh did not email a signed copy of the non-disclosure and non-circumvention agreement to F2E.

28.    Tim nevertheless represented to F2E on multiple occasions that he had obtained a signed non-disclosure and non-circumvention agreement from Josh.

29.    Tim further represented to F2E that the agreement Josh purportedly signed included non-disclosure obligations, duties to maintain the confidentiality of trade secrets and other confidential business information for the benefit of MIT, and duties to provide and/or return such information to MIT upon request.

Case 2:24-mc-00048-PA-PVC   Document 1-3   Filed 03/29/24   Page 9 of 31   Page ID
#:33
Case 1:23-cv-01608-LMB-JFA   Document 25   Filed 01/03/24   Page 8 of 30 PageID# 708

30. Tim has never provided a copy of Josh's signed non-disclosure and non-circumvention agreement to F2E, despite multiple requests from F2E that he do so. Tim has represented to F2E that he lost the signed non-disclosure and non-circumvention agreement at some point when his computer was damaged.

31. Upon information and belief, Tim never obtained a signed non-disclosure and non-circumvention agreement from Josh, contrary to his representations to F2E.

32. In or about April 2022, the members of MIT approved replacement non-disclosure and non-circumvention agreements to be given to both Josh and Fournier. Each replacement agreement contained a mutual acknowledgement that the parties had previously executed a non-disclosure and non-circumvention agreement dated June 6, 2013, and that the June 2013 non-disclosure and non-circumvention agreement subsequently was lost. Each replacement agreement also included a certification that Josh and Fournier had returned all of MIT's proprietary information, including trade secrets and other confidential business information, and had not shared such information with any unauthorized third parties.

33. F2E and Tim agreed that Tim was to present the replacement non-disclosure and non-circumvention agreements to both Josh and Fournier on behalf of MIT.

34. Tim presented Fournier with the replacement non-disclosure and non-circumvention agreement that had been approved by the members of MIT. Tim obtained Fournier's signature on the agreement in July 2022.

35. Tim represented to F2E that Josh also had signed the replacement non-disclosure and non-circumvention agreement that had been approved by the members of MIT.

36. Tim's representation that Josh had signed the replacement non-disclosure and non-circumvention agreement that had been approved by the members of MIT was false. When F2E

reviewed the agreement Josh had signed, F2E discovered that it differed materially from the agreement that had been approved by F2E and Tim.

37.     Unbeknownst to, and without the approval of, F2E, Tim had substantially and materially altered the replacement agreement Josh signed so that it only provided MIT with prospective confidentiality protections beginning in June 2022. Unbeknownst to, and without the approval of F2E, Tim removed any provision that applied to Josh's conduct between June 6, 2013—the purported date of the original non-disclosure and non-circumvention agreement—and the date of the replacement agreement.

38.     Tim never required Josh to sign the replacement non-disclosure and non-circumvention agreement approved by the members of MIT.

### July 2022 Agreement Transferring MIT Membership Units to Fournier

39.     On or about April 18, 2017, in exchange for additional financial contributions by F2E to MIT, Tim transferred six of his membership units in MIT to F2E. After the transfer, F2E owned approximately 81% and Tim owned approximately 19% of MIT.

40.     On or about July 27, 2022, MIT, F2E, Tim, and Fournier executed an agreement under which Tim transferred six of his remaining membership units to Fournier (the "July 2022 Agreement"). A true and accurate copy of the July 2022 Agreement is attached as **Exhibit F**. As a result of the July 2022 Agreement, the current ownership structure of MIT is as follows: F2E owns approximately 81%; Tim owns approximately 13%; and Fournier owns approximately 6%.

41.     Under § 6(ii) of the July 2022 Agreement, Tim and Fournier represented and warranted that they had turned over to MIT all confidential business information of MIT, including but not limited to all information relating to the design and manufacture of the ARES system.

42. Under § 6(iii) of the July 2022 Agreement, Tim and Fournier represented and warranted that they would destroy or erase all remaining electronic copies of MIT's confidential business information in their possession.

43. Under § 6(v) of the July 2022 Agreement, Tim and Fournier represented and warranted that there were no facts in their knowledge, or that reasonable should be in their knowledge, that would render any of their representations and warranties in the July 2022 Agreement misleading.

44. Tim's representations in §§ 6(ii) and 6(iii) of the July 2022 Agreement were false. At the time Tim signed the July 2022 Agreement, Tim had neither turned over any confidential business information to MIT nor destroyed all remaining copies of MIT's confidential business information in his possession.

### Josh's Work on ARES and False Statements About His Relationship with MIT

45. Beginning in 2013, Josh worked under Tim's supervision to assist him on the design, development, and production of the initial ARES model. Josh performed mechanical engineering and design work on ARES, including the design of foundational mechanisms, kinetic math calculations, structural hand calculations, stress analyses, and finite element analyses.

46. In connection with Josh's work on ARES, Tim provided Josh with access to MIT's trade secrets and other confidential business information relating to ARES, including but not limited to the product concept, functional capabilities, conceptual designs, and potential customers identified by F2E.

47. F2E allowed Tim to provide Josh with access to MIT's trade secrets and other confidential business information in reliance on Tim's representations to F2E that Josh had

10

signed a nondisclosure and non-circumvention agreement that protected MIT's rights and interests in such information.

48.      Among the types of confidential business information provided to Josh by Tim were ARES concepts and capabilities first developed for F2E, including a wireless touchscreen controller.

49.      Josh was never an officer or member of MIT. Unbeknownst to F2E, however, Josh held himself out to third parties and entered into at least one contract on behalf of MIT purportedly as MIT's Vice President of Engineering. Josh did so without any written employment or engagement agreement with MIT and without the knowledge or approval of F2E, MIT's majority member.

50.      F2E discovered that Josh was holding himself out as MIT's Vice President of Engineering only after reviewing marketing materials Tim and/or Josh had printed for distribution at an industry trade show.

51.      Upon information and belief, Tim knew that Josh was holding himself out to third parties and entered into at least one contract on behalf of MIT as a purported officer of MIT without the knowledge and approval of F2E, MIT's majority member. Tim took no action to prevent Josh from doing so.

52.      On the contrary, Tim repeated and promoted Josh's misrepresentations about his relationship with MIT and made similar misrepresentations about Tim's own relationship with MIT.

53.      In or about 2017, Tim registered a website for MIT in his own name. Tim maintained exclusive access and control over MIT's website until at least September 2022, despite repeated requests from F2E that Tim provide F2E with access to and control over the website.

54.      From 2017 until at least September 2022, Tim identified himself on MIT's website as MIT's CEO and Josh as MIT's Vice-President of Engineering, even though Tim was not MIT's CEO and Josh was never an officer or member in MIT.

55. From 2017 until at least September 2022, Tim also represented to the public on MIT's website that Tim and Josh were the sole designers and inventors of ARES, even though other individuals and entities also were materially involved with the design. Tim also made other false statements about ARES and MIT on MIT's website.

56. As of the date of this Complaint, Tim continues to represent to the public on his personal website that he is the inventor and manufacturer of ARES.

### Tim and Josh's Scheme to Misappropriate
### MIT's Confidential Information and Intellectual Property Rights

57. Upon information and belief, in or about 2015, Tim and Josh formed a common scheme to wrongfully establish control over MIT's confidential business information and intellectual property rights.

58. On or about January 28, 2015, Tim filed a provisional patent application in which Tim and Josh claimed to be the sole inventors of the initial version of ARES. No further action was taken on the provisional patent application filed by Tim in January 2015.

59. On November 20, 2018, however, Josh filed another provisional patent application in which he claimed to be the sole inventor of the initial version of ARES. Josh did so with the knowledge and approval of Tim, but without the knowledge or approval of F2E.

60. On November 19, 2019, Josh filed a patent application for the ARES system in which he named himself as sole inventor. Josh did so with the knowledge and approval of Tim but without the knowledge or approval of F2E. Josh also did so without assigning ownership of the patent to MIT.

61. The U.S. Patent and Trademark Office published Josh's patent application on its website on May 21, 2020, and awarded the ARES patent (U.S. Patent No. 11,174,677 B2) to Josh on November 16, 2021 with Josh—not MIT—as the owner. Neither Tim nor Josh made F2E aware of either of

those events. F2E learned of the ARES patent for the first time in or about March 2022 while reviewing an MIT investor presentation prepared by Tim that mentioned the patent.

62. F2E never authorized the filing of any patent application for ARES.

63. The unauthorized patent applications filed by Josh contained confidential information about ARES that MIT did not want or expect to be disclosed to the public.

64. Moreover, Josh's patent application contained numerous deficiencies that are likely to invalidate the ARES patent.

65. Around the same time Josh was acting to obtain a patent for ARES in his own name in furtherance of his and Tim's common scheme to misappropriate MIT's intellectual property rights, Tim and Josh also took measures to seize control of MIT's confidential business information.

66. In or about 2016, F2E determined that the original ARES concept was not headed in the right direction and needed to be modified. F2E requested that MIT retain a professional engineering firm to help work on a new version of ARES, which F2E envisioned being mounted on an armored vehicle.

67. F2E identified Lenco Armored Vehicles, Inc. ("Lenco"), a major armored vehicle manufacturer, to provide the armored vehicle on which the redesigned ARES would be mounted. MIT and Lenco entered into an agreement under which Lenco provided the armored vehicle free of charge to assist MIT with marketing the redesigned ARES.

68. F2E also found two companies to assist MIT with mechanical and computer engineering tasks on the redesigned ARES: Cardinal Scientific, Inc. ("Cardinal"), and 21st Century Software Group, Inc. ("21st Century").

69.     In or about April 2017, MIT entered into a contract with Cardinal. Pursuant to the contract, Cardinal was given confidential information about ARES by MIT and generated confidential work product on behalf of MIT. Cardinal was paid for its work by MIT.

70.     Upon the completion of its work, however, Cardinal returned MIT's confidential materials and work product—including 3-D models, shop drawings, photographs, and videos of the ARES system components—to Josh and Tim.

71.     In or about July 2017, Josh signed a contract purportedly on behalf of MIT with 21st Century under which 21st Century was tasked with working on the wireless controller and tablet design for the ARES system. Josh signed the contract in his purported capacity as MIT's Vice President of Engineering, even though Josh was not an officer or member of MIT and had no authority to bind MIT. An initial, unexecuted version of MIT's contract with 21st Century provided for Tim to sign on behalf of MIT. Tim modified the contract without F2E's knowledge or approval, however, to instead provide for Josh to sign on behalf of MIT.

72.     Pursuant to the contract, 21st Century was given confidential information about ARES by MIT and generated confidential work product on behalf of MIT. Upon completion of its work, however, the 21st Century contract that Tim had modified without F2E's knowledge or approval required 21st Century to return its work product and MIT's confidential materials—including the source code for the ARES control system—only to Josh and not to MIT.

73.     From 2017 until at least September 2022, Tim maintained exclusive access and control over MIT's website—which contained numerous false and misleading statements—despite F2E's repeated demands that Tim provide F2E with access to and control over the website. Tim also set up an unauthorized MIT email account and unauthorized MIT social media accounts, over which Tim

14

maintained exclusive access and control. Until at least September 2022, Tim refused to provide F2E with access to those accounts despite repeated demands that he do so.

74.    In or about August 2019, one of MIT's production contractors, IBIS TEK, LLC ("IBIS"), required certain design, development, and manufacturing information concerning ARES to perform its work for MIT. IBIS had been subject to a non-disclosure and non-circumvention agreement with MIT since 2015 that protected confidential materials provided to IBIS by MIT, but not materials IBIS received from third parties.

75.    F2E directed both Tim and Josh to provide the requested materials to F2E so they could be delivered to IBIS on behalf of MIT. Both Tim and Josh ignored F2E's request.

76.    F2E then engaged an attorney on behalf of MIT to write letters to Tim and Josh demanding that they supply F2E with the information requested by IBIS. Both Tim and Josh also ignored those demands.

77.    Instead, without F2E's knowledge or approval, Josh sent MIT's confidential business information concerning ARES directly to IBIS, even though Josh was not a member or officer of MIT and was not authorized to act on behalf of MIT.

78.    Both Josh and Tim have refused to disclose to F2E what specific confidential business information Josh sent to IBIS.

79.    Tim and Josh have attempted to use their wrongful control over MIT's confidential business information and intellectual property rights to extract additional ownership shares in MIT and other concessions from F2E.

80.    In or about 2015, Tim advised F2E that he wanted to transfer 4% of his membership units in MIT to Josh and 2% to Fournier. F2E agreed with Tim's proposal.

81.    Despite F2E's agreement, however, Tim never transferred any of his membership units in MIT to Josh or otherwise compensated Josh for Josh's work assisting Tim on behalf of MIT.

82.    In or about November 2017, MIT demonstrated the redesigned ARES model at the Milipol Paris defense-industry trade show. The redesigned ARES model received favorable interest from several international customers.

83.    Shortly after seeing the market's favorable reception to the redesigned ARES model, Josh demanded a 10% ownership interest in MIT. F2E rejected Josh's demand and advised Josh that any units of ownership in MIT would need to come exclusively from Tim's units in the company, in accordance with F2E's agreement with Tim at the company's founding.

84.    Even though F2E would not agree to Josh's demand for a 10% ownership interest in MIT, F2E offered Josh full-time employment with MIT. Josh rejected F2E's offer of full-time employment.

85.    Tim never transferred any portion of his ownership interests in MIT to Josh.

86.    Instead, in March 2022, immediately after Alubbad discovered that a patent had been issued to Josh on ARES, Tim proposed an agreement to F2E under which Josh would assign the ARES patent to MIT in exchange for 5% of the membership units in MIT, without specifying that the membership units to be given to Josh would be taken from Tim's (and not F2E's) membership units.

87.    Upon information and belief, Tim and Josh had wrongfully amassed control over MIT's confidential business information and intellectual property rights for the specific purpose of extracting that and other concessions from F2E.

88.    F2E did not agree to the agreement proposed by Tim in March 2022.

89.     In or about April 2022, after F2E rejected the agreement proposed by Tim in March 2022, Tim requested that MIT's attorney prepare a set of agreements regarding several matters at issue among MIT, F2E, Tim, Josh, and Fournier. That set of agreements included the July 2022 Agreement.

90.     In connection with the drafting of those new agreements, Tim informed F2E for the first time that Josh had personally made a payment of $30,000 to 21st Century with Tim's knowledge and approval but without F2E's knowledge or approval. Neither Tim nor Josh had informed F2E about that payment, nor have they ever provided MIT with an invoice or any other support for the payment.

91.     F2E contributed funds to MIT for the specific purpose of paying MIT's contractors, including 21st Century. Tim was responsible for paying MIT's contractors, including 21st Century, with the funds contributed to MIT by F2E.

92.     Around the same time Tim informed F2E that he had allowed Josh to pay 21st Century with Josh's own funds, F2E discovered that Tim had used the funds F2E had earmarked for 21st Century for purported business expenses. Tim has not provided MIT with any documentation to substantiate those purported business expenses.

93.     Tim's diversion of the funds F2E had earmarked for 21st Century was done without F2E's knowledge or approval.

94.     MIT has undertaken extensive efforts, both directly and through legal counsel, to recover MIT's trade secrets and other confidential business information from Tim and Josh. Among the information MIT has sought to recover are electronic files containing 3D models of ARES; shop drawings, photographs, and videos of ARES components; source files for the wireless controller developed for MIT by 21st Century; and other intellectual property.

95.    It was not until December 2022 that Tim agreed to return to MIT, and did in fact return to MIT, at least some of MIT's intellectual property, including trade secrets and other confidential business information. MIT has been unable to confirm whether Tim has returned all such materials in his possession, custody, or control.

96.    As of the filing of this Complaint, Josh continues to refuse MIT's demands to (a) disclose the whereabouts of all of MIT's intellectual property, including trade secrets and other confidential business information; (b) return all of MIT's intellectual property, including trade secrets and other confidential business information, in his possession, custody, or control; and (c) identify any unauthorized third parties to whom any of MIT's intellectual property, including trade secrets and other confidential business information, has been disclosed.

**False Representations Regarding Patent Assignment Agreement**

97.    The set of agreements MIT's attorney prepared in April 2022 included an agreement regarding the assignment of the ARES patent by Josh to MIT.

98.    The members of MIT approved a patent assignment agreement to be given to Josh under which Josh would assign the ARES patent to MIT for a nominal payment (the "Patent Assignment Agreement"). A true and accurate copy of the Patent Assignment Agreement approved by the members of MIT is attached as **Exhibit I**.

99.    The members of MIT agreed that Tim was to present the Patent Assignment Agreement to Josh on behalf of MIT.

100.    Tim represented to F2E that Josh had signed the Patent Assignment Agreement as approved by the members of MIT.

101.    Tim's representation that Josh had signed the Patent Assignment Agreement as approved by the members of MIT was false. When F2E reviewed the patent assignment agreement Josh had

18

signed, F2E discovered that it differed materially from the Patent Assignment Agreement that was approved by F2E and Tim.

102.    Unbeknownst to, and without the approval of, F2E, Tim had substantially and materially altered the patent assignment agreement that Josh ultimately signed. Unbeknownst to, and without the approval of, F2E, Tim had inserted a provision under which MIT would pay Josh $30,000 as reimbursement for the funds Josh purportedly had personally paid to 21st Century, as well as up to $10,000 for patent expenses incurred by Josh, among other unauthorized changes. A true and

**COUNT I**
**Breach of Fiduciary Duties**
**(Against Tim)**

103.    Paragraphs 1 through 102 above are incorporated herein by reference.

104.    The MIT Operating Agreement is a binding and enforceable contract.

105.    F2E has fully performed its obligations under the MIT Operating Agreement.

106.    Section 7(D) of the MIT Operating Agreement specifies the fiduciary duties applicable to MIT's officers under Delaware law. It provides that each of MIT's members and officers "shall exercise all powers and duties entrusted to him, her, or it, in the matters such person, individually or on behalf of an entity, believes in good faith to be in the best interest of the LLC, using a standard of care as a person in a like position would use under similar circumstances, including reasonable inquiry and ordinary prudence."

107.    Tim breached his duty of loyalty to MIT by failing to perform his duties as President of MIT in a manner he believed in good faith to be in the best interest of MIT, as alleged herein.

108.    Tim breached his duty of care to MIT by failing to perform his duties as President of MIT using the standard of care a person in a like position would use under similar circumstances, including reasonable inquiry and ordinary prudence, as alleged herein.

109.   Tim breached his fiduciary duties to MIT by, among other wrongful conduct, (a) willfully disregarding his duty to protect MIT's intellectual property, including its trade secrets and other confidential business information; (b) allowing his son, Josh, to improperly possess MIT's intellectual property, including its trade secrets and other confidential business information; (c) empowering his son, Josh, to assert ownership of MIT's intellectual property, including its trade secrets and other confidential business information, including by obtaining a patent for ARES in his own name and without assignment to MIT; (d) refusing to identify or confirm the whereabouts of MIT's intellectual property, including its trade secrets and other confidential business information; (e) willfully registering a website for MIT in his own name rather than in MIT's name and refusing to assign his rights to the website to MIT; (f) incurring unauthorized liabilities on behalf of MIT; (g) engaging in unauthorized activities within the scope of MIT's business; and (h) otherwise acting to the detriment of MIT to try to gain financial advantage for himself and his son, Josh.

110.   MIT has suffered and continues to suffer damages as a result of Tim's breach of his fiduciary duties, as alleged herein.

**COUNT II**
**Misappropriation of Trade Secrets**
**(Against Tim and Josh)**

111.   Paragraphs 1 through 110 above are incorporated herein by reference.

112.   As a member and officer of MIT, Tim was given access to and use of MIT's trade secrets, as that term is defined under the Virginia Uniform Trade Secrets Act ("VTUSA"), VA. CODE ANN. §§ 59.1-336, *et seq.*

113.    The trade secrets to which Tim had access to and use of included but were not limited to concepts, uses, designs, adaptations, costs, and sales information for the ARES system, none of which are generally known to the public.

114.    At all relevant times, MIT undertook reasonable efforts to maintain the confidentiality of such information. MIT's efforts included but were not limited to confidentiality obligations in the MIT Operating Agreement and strict requirements that employees and independent contractors sign non-disclosure and non-circumvention agreements before accessing or using such information.

115.    Both Tim and Josh knew of MIT's efforts to maintain the confidentiality of its trade secrets and other confidential business information.

116.    Upon information and belief, Tim did not require his son, Josh, to sign a non-disclosure and non-circumvention agreement before accessing and using MIT's trade secrets and other confidential business information.

117.    In the alternative, Tim knowingly and willfully refused to require Josh to sign a replacement non-disclosure and non-circumvention agreement after Tim became aware that MIT no longer possessed Josh's initial non-disclosure and non-circumvention agreement with MIT.

118.    Even though Josh was not subject to any non-disclosure and non-circumvention agreement with MIT, or, in the alternative, was not subject to any non-disclosure and non-circumvention agreement in MIT's possession, Tim knowingly and intentionally provided Josh with access to and the use of MIT's trade secrets and other confidential business information, as alleged herein.

119. Josh intentionally has maintained access to and control over MIT's trade secrets and other confidential business information with knowledge that he is not authorized to do so, as alleged herein.

120. Josh knowingly and intentionally disclosed MIT's trade secrets and other confidential business information to a least one third party with knowledge that he was not authorized to do so.

121. Tim and Josh knowingly and intentionally have exploited their possession and control over MIT's trade secrets and other confidential business information to try to extract financial and other concessions from MIT, as alleged herein.

122. Tim's and Josh's conduct has been willful and malicious, as alleged herein.

123. MIT has suffered and continues to suffer damages as a result of Tim's and Josh's misappropriation.

## COUNT III
### Business Conspiracy
### (Against Tim and Josh)

124. Paragraphs 1 through 123 above are incorporated herein by reference.

125. Tim and Josh combined, associated, agreed, mutually undertook, and/or concerted together to injure MIT's reputation, trade, business, or profession by misappropriating MIT's intellectual property, trade secrets, and other confidential business information, as alleged herein.

126. Tim's and Josh's conduct was and continues to be willful and malicious, as alleged herein.

127. MIT has suffered and continues to suffer damages as a result of Tim's and Josh's conduct, as alleged herein.

128. Tim and Josh are liable to MIT under Virginia's business conspiracy statute, VA. CODE ANN. §§ 18.2-499, *et seq.*, as alleged herein.

## COUNT IV
### Unjust Enrichment
### (Against Josh)

129. Paragraphs 1 through 128 above are incorporated herein by reference.

130. Josh has no legal right to possess, use, or retain MIT's intellectual property, including its trade secrets and other confidential business information, as alleged herein.

131. Despite having no legal right to possess, use, or retain MIT's intellectual property, Josh filed a patent application in which he falsely represented that he was the sole inventor of the ARES design, as alleged herein.

132. Despite Josh having no legal right to possess, use, or retain MIT's intellectual property, the U.S. Patent and Trademark Office awarded Josh a patent on the ARES system. Josh continues to assert sole ownership of that patent.

133. Josh continues to possess and use MIT's intellectual property, including its trade secrets and other confidential business information, despite having no legal right to do so, as alleged herein.

134. Josh has been unjustly enriched by the value and use of MIT's intellectual property, including its trade secrets and other confidential business information, as alleged herein.

135. It would be inequitable for Josh to retain the benefits derived from his possession and use of MIT's intellectual property, including its trade secrets and other confidential business information, without compensating MIT, as alleged herein.

## COUNT V
### Common-Law Fraud
### (Against Tim)

136. Paragraphs 1 through 135 above are incorporated herein by reference.

Case 2:24-mc-00048-PA-PVC    Document 1-3    Filed 03/29/24    Page 25 of 31    Page ID
#:49
Case 1:23-cv-01608-LMB-JFA    Document 25    Filed 01/03/24    Page 24 of 30 PageID# 724

137. Tim represented to F2E on numerous occasions that Josh had executed a non-disclosure and non-circumvention agreement that protected MIT's intellectual property, including its trade secrets and other confidential business information, as alleged herein.

138. Upon information and belief, Tim's representations that Josh had executed a nondisclosure and non-circumvention agreement that protected MIT's intellectual property, including its trade secrets and other confidential business information, were false.

139. Upon information and belief, Tim made the aforementioned representations with actual knowledge of their falsity or with reckless indifference to their truth, as alleged herein.

140. Tim made the aforementioned representations to induce MIT to authorize Tim to engage Josh to assist him in performing work on the ARES system, as alleged herein.

141. Tim made the aforementioned representations to induce MIT to allow Josh to access and use MIT's intellectual property, including its trade secrets and other confidential business information relating to ARES, as alleged herein.

142. MIT specifically relied on Tim's false representations in authorizing Tim to have Josh assist him in performing work on the ARES system, as alleged herein.

143. MIT specifically relied on Tim's false representations in allowing Josh to access and use MIT's intellectual property, including its trade secrets and other confidential business information relating to ARES, as alleged herein.

144. MIT has suffered and continues to suffer damages as a direct and proximate result of Tim's false representations, as alleged herein.

**COUNT VI**
**Breach of Contract**
**(Alleged in the Alternative Against Josh)**

145. Paragraphs 1 through 144 above are incorporated herein by reference.

146.   Josh entered into a non-disclosure and non-circumvention agreement with MIT in 2013 that protected MIT's intellectual property, including its trade secrets and other confidential business information (the "2013 NDA"), as alleged herein.

147.   The 2013 NDA is a binding and enforceable contract.

148.   MIT has fully performed its obligations under the 2013 NDA.

149.   Under 2013 NDA, Josh agreed that all information provided by or developed for MIT, including information about the ARES system, was the exclusive property of MIT. Josh further agreed to assign to MIT any rights he otherwise could claim in such information.

150.   The 2013 NDA obligated Josh to maintain the confidentiality of trade secrets and other confidential business information provided by or developed for MIT and to provide and/or return such information to MIT upon request.

151.   Josh breached the 2013 NDA by, among other wrongful conduct, (a) asserting a personal interest in MIT's intellectual property; (b) publishing aspects of the ARES design without authorization; (c) otherwise disclosing MIT's intellectual property, including its trade secrets and other confidential business information, to at least one third party; and (d) refusing to return and/or destroy MIT's intellectual property, including its trade secrets and other confidential business information.

152.   MIT has suffered and continues to suffer damages as a result of Josh's breaches, as alleged herein.

## COUNT VII
## Breach of Contract
## (Against Tim)

153.   Paragraphs 1 through 152 above are incorporated herein by reference.

154.   The July 2022 Agreement is a binding and enforceable contract, as alleged herein.

155.    MIT has fully performed its obligations under the July 2022 Agreement, as alleged herein.

156.    Tim represented and warranted in § 6(ii) of the July 2022 Agreement that he had returned to MIT all confidential business information of MIT, including but not limited to all information regarding the design and manufacture of the ARES system.

157.    Tim represented and warranted under § 6(iii) of the July 2022 Agreement that he would destroy or erase all remaining copies of MIT's confidential business information in his possession.

158.    Tim represented and warranted in § 6(v) of the July 2022 Agreement that there were no facts in his knowledge, or that reasonably should be in his knowledge, that would render misleading any of his other representations in the July 2022 Agreement.

159.    Tim's representations in the July 2022 Agreement were false. At the time Tim executed the July 2022 Agreement, he had not returned MIT's confidential business information and destroyed and/or deleted any remaining copies in his possession, as alleged herein.

160.    MIT suffered damages as a result of Tim's breaches, as alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Mission Integrated Technologies, LLC, respectfully requests that this Court enter judgment in its favor and award the following relief:

    A.    Three times its actual damages, in an amount to be proven at trial, for which Tim and Josh shall be jointly and severally liable;

    B.    Incidental and consequential damages, in an amount to be proven at trial, for which Tim and Josh shall be jointly and severally liable;

26

Case 2:24-mc-00048-PA-PVC    Document 1-3    Filed 03/29/24    Page 28 of 31    Page ID
#:52
Case 1:23-cv-01608-LMB-JFA    Document 25    Filed 01/03/24    Page 27 of 30 PageID# 727

C.    Punitive damages in an amount not to exceed twice any award made at trial under VA. CODE ANN. § 59.1-338(A), for which Tim and Josh shall be jointly and severally liable;

D.    Additional punitive damages against Tim in an amount to be determined at trial;

E.    An injunction against Tim (a) prohibiting Tim from any future access to or use of, directly or indirectly, MIT's intellectual property, trade secrets and other confidential business information; and (b) prohibiting Tim from engaging in any other conduct that violates his contractual and fiduciary duties to MIT;

F.    An injunction against Josh (a) requiring Josh to transfer to MIT all rights to, ownership in, and access to all of MIT's intellectual property, trade secrets, and other confidential business information, including but not limited to the ARES patent; (b) requiring Josh to return to MIT all of MIT's intellectual property, trade secrets, and other confidential business information in his possession, custody, or control; (c) requiring Josh to destroy and/or delete any remaining copies of MIT's intellectual property, trade secrets, and other confidential business information in his possession, custody, or control; (d) requiring Josh to disclose to MIT the whereabouts of any other MIT intellectual property, trade secrets, and other confidential business information; (e) requiring Josh to disclose to MIT any instances in which MIT's intellectual property, trade secrets, and other confidential business information were disclosed to any third party without authorization; and (f) prohibiting Josh from any future access to or use of, directly or indirectly, of MIT's intellectual property, trade secrets, and other confidential business information;

27

G.    Reasonable costs and attorneys' fees, for which Tim and Josh shall be jointly and severally liable; and

H.    Such other relief the Court deems just and proper.

Dated: January 3, 2024

Respectfully submitted,

_____ */s/ Laurin H. Mills* _____
Laurin H. Mills (VSB No. 09462)
Brian P. Donnelly (VSB No. 82052)
Werther & Mills, LLC
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314
Phone: (703) 547-4696
Fax: (240) 912-3031
Laurin@werthermills.com
bdonnelly@werthermills.com

*Counsel For Mission Integrated Technologies, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of January, 2024, a copy of the foregoing Amended Complaint was filed via the Court's CM/ECF electronic filing system, which will serve the following:

> Rebecca LeGrand
> LeGrand Law PLLC
> 1100 H Street NW, Suite 1220
> Washington, D.C. 20005
> (202) 587-5725
> rebecca@legrandpllc.com
>
> *Counsel for Joshua R. Clemente*
>
> Timothy G. Clemente
> 498 Fleshman Creek Road
> Livingston, MT 59407
> (540) 845-5169
> timclemente@aol.com
>
> *Pro Se Defendant*

I further certify that a copy of the foregoing was served by First Class Mail on the following:

> Timothy G. Clemente
> 498 Fleshman Creek Road
> Livingston, MT 59407
> (540) 845-5169
> timclemente@aol.com
>
> *Pro Se Defendant*

*/s/ Laurin H. Mills*
Laurin H. Mills